AO 106 (Rev. 04/10) Application for a Search Warrant                    AUTHORIZED AND APPROVED/DATE:

# UNITED STATES DISTRICT COURT

**FILED**

for the

Western District of Oklahoma

MAR 2 2 2024

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIS. OKLA.
BY_____,DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Premises known as 4720 S. Western Ave., Oklahoma City, Oklahoma 73109, surrounding curtilage, and any vehicles, garages, and outbuildings thereon

)
)
)
)
)
)

Case No. M-24-247    -STE

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 21 U.S.C. § 841 | Distribution of a Controlled Substance |

The application is based on these facts:

See attached Affidavit of FBI Special Agent Hanna Ortego

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:(_____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Hanna Ortego, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/22/24

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma          SHON T. ERWIN, United States Magistrate Judge
*Printed name and title*

## WESTERN DISTRICT OF OKLAHOMA

## OKLAHOMA CITY, OKLAHOMA

STATE OF OKLAHOMA      )
                                            )
COUNTY OF OKLAHOMA )

### AFFIDAVIT

I, Hanna Ortego, Special Agent with the Federal Bureau of Investigation (FBI), having been duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I have been a Special Agent with the FBI since June 2022. Prior to this appointment, I was assigned to the FBI New Orleans Field Office, Lafayette Resident Agency, as a Safe Streets Task Force Officer from June 2019 until my appointment as an FBI Special Agent. I am currently assigned to the Oklahoma City Division, where I am assigned to the Criminal Enterprise Squad, which is responsible for investigating, among other things, the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. Through my training and experience, I have become familiar with the methods and operation of drug distributors, including their common organizational structures, use of violence, methods of manufacturing, distributing, storing, and transporting drugs, and methods of collecting and laundering drug proceeds. As part of my investigative experience as an FBI Special Agent, I have been the affiant in multiple Title III wire intercept affidavits, executed search and arrest

warrants, conducted physical surveillance, coordinated controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

2.    The facts set forth below are based upon my own personal observations, reports and information provided to me, other documents obtained during the course of this investigation.  All of the below-described dates and times are approximate.

3.    The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure a search warrant for the business of EA Pando Investments/Pando Capital Group located at 4720 S Western Ave, Oklahoma City, Oklahoma 73109 (the **Subject Property**), as described further in **Attachment A** (physical description) for evidence of violations of 21 U.S.C. § 841(a)(1) (manufacturing, possessing, distributing and selling of controlled substances) and 21 U.S.C. § 846 (drug conspiracy), as described further in **Attachment B** (description of items to be seized).  Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this

investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrant.

## BACKGROUND ALLEGATIONS REGARDING DRUG CASES AND MONEY LAUNDERING

4.     As discussed previously, I am, based on my training and experience, as well as the training and experience of other investigators in this case with whom I have consulted, familiar with the *modus operandi* of drug trafficking organizations (DTOs).  I am also familiar with the many ways in which DTOs will attempt to launder their illicit proceeds.  Based on my training and experience, and participation in other money laundering and drug-related investigations, I know the following:

a)     I am aware that money launderers connected to DTOs frequently keep assets, records, documents related to their transfer activities, and monies derived from the sale of illegal narcotics at private residences and businesses, sometimes acting in a "shell" capacity, where they are not easily detectable by law enforcement officials conducting investigations, and further that these individuals will frequently maintain these locations in the name of other individuals, also to avoid detection by law enforcement agencies;

b)     I am aware that money launderers connected to DTOs often own and operate seemingly legitimate businesses, sometimes hidden

within larger businesses, and that money launderers often commingle lawful monetary transfers with unlawful transactions;

c) I am aware that even though those businesses and properties are under an alias or other persons' names, money launderers continue to use and exercise dominion and control over them;

d) I am aware that money launderers connected to DTOs often maintain on-hand quantities of currency, often derived from unlawful activities such as drug-trafficking, in order to methodically transfer the funds, sometimes by "structuring", often over prolonged periods of time, to avoid law enforcement detection, financial reporting requirements, and the additional scrutiny that using a bank invites;

e) I am aware that money launderers connected to DTOs maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the receipt, transfer, and storage of financial instruments related to unlawful activities, even though such documents may be in code. It is particularly common that individuals engaged in money laundering connected to DTOs will keep ledgers related to their illegal activity because drug dealers commonly deposit large amounts of currency, often multiple times per week, and the money launderers often deal with more than one DTO at any particular time;

4

f)    I am aware that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the money launderers have ready access to them, i.e., homes, automobiles, businesses, and safe houses, and that the most common place for these items to be located is at the businesses used to execute the unlawful monetary transfers.  Further, I know that money launderers associated with DTOs often keep these records for significant periods of time, as sometimes an accounting can be required.

g)    I am aware that money launderers connected to DTOs will frequently keep records, notes, ledgers, contact lists, and other evidence of their financial dealings with DTOs on cellular phones, and that they often keep such cellular phones on their person or in the properties that they control.  I am also aware that money launderers connected to DTOs will use computers and tablets to further their financial businesses using digital communication, including, but not limited to, e-mail and instant messaging;

h)    I am aware that it is common for money launderers connected to DTOs to conceal contraband, proceeds of drug sales, and records related to drug proceeds or drug proceeds transfers in secure locations within residences, garages, storage buildings, safes, and safety

deposit boxes for ready access, and also to conceal such items from law enforcement agencies;

i)      I am aware that to accomplish the overall goals of distribution of currency for DTOs, money launderers utilize, including but not limited to, banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations, and business fronts;

j)      I am aware that money launderers connected to DTOs commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their DTO associates, as well as those that assist in their financial transactions, even if said items may be in code.

## PROBABLE CAUSE

5.      As explained herein, the **Subject Property** is being used by Ever Pando (**PANDO**) in furtherance of drug and money laundering conspiracies led by a Mexico-based DTO.

6.      Law enforcement first became aware of Oscar Hernandez (Hernandez) and the drug trafficking organization (the "DTO") described herein in 2018 during an investigation targeting the Irish Mob Gang ("IMG"), an Oklahoma prison gang that was trafficking drugs across the state of Oklahoma and beyond.  During the investigation, which utilized Title III

6

wiretaps, law enforcement intercepted Hernandez and identified him as one of the IMG's principal sources of supply of methamphetamine. These IMG members and their associates were ultimately indicted and convicted. *See United States v. Velasquez*, CR-18-260-SLP. Next, from roughly 2019 to 2021, law enforcement began targeting Hernandez's distribution network. During that portion of the investigation ("Phase 1") investigators uncovered a massive methamphetamine distribution network led by Hernandez.

7.    Phase 1 established that Hernandez, who was residing in San Luis Potosi, Mexico, relied on trusted family members and confidants in Oklahoma to conduct the day-to-day operations of the DTO. Those individuals in Oklahoma distributed thousands of pounds of methamphetamine to customers of the DTO and collected millions of dollars in drug proceeds—all at Hernandez's direction. Prior to that distribution, the crystal meth was converted from its liquid form at multiple clandestine laboratories in rural Oklahoma. While these labs were owned by Hernandez's family members and co-conspirators, the individuals that worked at the labs (hereafter referred to as the "lab workers") appeared to report to the ultimate source of supply, whom cooperators identified as "Mamisan". Law enforcement also found evidence indicating "Mamisan" was the individual responsible for coordinating the shipments of liquid methamphetamine from Mexico to Oklahoma; the investigation established that the methamphetamine was being transported in

7

the fuel tanks of a semi-truck, which was owned by and registered to a company called DGC Express. DGC Express, in turn, listed its registered agent as Nelly Gutierrez (Nelly), according to the Texas office of the comptroller. Once the semi-truck arrived in Oklahoma, it was received by the lab workers at a private location, where the liquid methamphetamine could be extracted, placed into transportable containers, and ultimately taken to the clandestine lab location for conversion.

8.    As a result of Phase 1 of the investigation, federal charges were filed in the Western District of Oklahoma against more than forty persons, including Hernandez (*see* United States v. Hernandez, CR-21-76-SLP), members of his incarcerated customer base (*see* United States v. Baswell, CR-21-77-SLP), and two truck drivers (*see* United States v. Cedillo, CR-21-288-SLP, and United States v. Lucio, CR-21-289-SLP).    In addition, law enforcement executed over a dozen search warrants, including at the liquid methamphetamine delivery location and two clandestine labs used by the DTO.    Law enforcement also made significant drug and money seizures, including over one thousand pounds of methamphetamine and more than $1 million in U.S. currency.    At the time, this coordinated effort significantly disrupted Hernandez's and the overall DTO's operation.    It was not until the fall of 2022, however—with the help of a newly developed confidential human

source (CS1)[1]—that law enforcement launched the second phase of the investigation into the DTO described herein.

9.      Since phase two of the investigation launched, law enforcement has once again identified new locations where a semi-truck delivers liquid meth, along with multiple rural clandestine lab locations.

10.     One of the private locations the DTO has used to receive shipments of liquid meth is 701 SE 29th Street, Oklahoma City, Oklahoma—a more than 5,000 square foot warehouse with large garage bay door access, owned by EA Pando Investments LLC (the "29th St. Shop"). Ever Pando (**PANDO**) is the owner and registered agent of EA Pando Investments LLC, which is located at the **Subject Property**. Law enforcement has recorded members of the DTO receiving shipments of liquid methamphetamine at the 29th St. Shop throughout this investigation. For instance, on November 17, 2023, United

---

[1]    CS1 was arrested by law enforcement for drug related crimes. CS1 thereafter agreed to assist law enforcement and began providing information relating to this investigation in the fall of 2022. Prior to this last arrest, CS1 had been convicted of drug related crimes in 1998 (manufacturing), 2007 (trafficking), and 2021 (possession). CS1 furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending charges. CS1 has also received $1,000 in monetary compensation to date for his/her cooperation. The information provided by CS1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, and telephone analysis. Information provided by CS1 has been reliable and I am unaware of any knowingly false information furnished by CS1. Information attributed to CS1 herein, unless otherwise noted, was obtained by CS1 through his/her personal observations or conversations with targets of this investigation and their associates.

9

States District Judge Jodi W. Dishman for the Western District of Oklahoma, issued two orders—the first authorizing the interception of oral communications inside the 29th St. Shop and the second authorizing the continued monitoring and recording of visual, non-verbal conduct inside the same location. With that authorization, law enforcement observed two deliveries of liquid meth inside the 29th St. Shop, the first on November 17, 2023, and the second on December 6, 2023. On both occasions, a black 2015 Cascadia Freightliner with a "DARE Express" emblem on the side and no trailer attached (the "black semi-truck")[2] pulled into the large middle garage bay of the 29th St. Shop. Once inside, two individuals—Edgar Rodriguez Ontiveros (Rodriguez) and Jose Equihua (Equihua)—extracted the liquid meth from inside the passenger side fuel tank of the black semi-truck into a large IBC tank housed inside of a black, pull-behind trailer. Also on both occasions, the liquid meth inside the black, pull-behind trailer, was later transported to the DTO's clandestine conversion lab at 980801 S Stage Coach Drive, Wellston, Oklahoma—a rural, five-acre property also owned by EA Pando Investments LLC that has both a residence and a detached garage (the "Wellston lab").

11.     On December 8, 2023, two days after the apparent liquid meth delivery at the 29th St. Shop, a search warrant was executed at the Wellston

---

[2]     This semi-truck was issued to Dare Express LLC at 1111 Champion Drive, Donna, Texas. Dare Express is a trucking company owned by Denis Gutierrez, believed to be Nelly's husband.

lab. Law enforcement found a fully functioning meth conversion lab, recovered more than 1000 lbs. of liquid and crystal meth[3], and arrested both Rodriguez and Equihua.

12.    The 29th St. Shop was purchased by EA Pando Investments on September 7, 2022. This purchase was facilitated by a $546,314.52 wire transfer from EA Pando Investment's Bancfirst account ending in 1622 (the EA Pando Account).[4]  At the time of purchase, all three garage bay doors on the front of the building were twelve feet high.  Shortly after the purchase, a modification was made to the middle bay door, thereby raising the clearance to more than twelve feet to allow a semi-truck to enter the building, which indicated to law enforcement that the 29th St. Shop purchase was specifically made using the EA Pando Account to facilitate the DTO's drug distribution.

13.    Based on the investigation, I also believe **PANDO** was fully aware and authorized this modification.  Following the seizure of the liquid meth at the Wellston lab and the arrest of Equihua and Rodriguez, law enforcement interviewed **PANDO** at the Subject Property.  During this interview, **PANDO** stated that all modifications to his rental properties are only made with his

---

[3]    Field tests resulted in presumptive positives, and official results from the DEA lab in Dallas, Texas confirmed the substances as methamphetamine.

[4]    At least a portion ($366,000) of this wire payment appears to have been facilitated by an advance from a line of credit account EA Pando Investments has access to.

consent. Moreover, pursuant to a court-authorized search warrant, law enforcement has searched the contents of **PANDO's** cellphone. The phone contained a conversation over WhatsApp—an encrypted communication platform—between **PANDO** and an unidentified male (UM1) at (816) 562-6758. On October 18, 2022, UM1 inquired about raising one of the garage bay doors.[5] On October 20, 2022, **PANDO** indicated the cost to modify the garage door would be $2,600 and provided the contact information for Jose Herrera (Herrera) as the person to complete the modification.[6]

14.  Another WhatsApp conversation discovered on **PANDO's** cell phone, this time with another unidentified male (UM2) using the Mexican phone number 52-554-548-4825, provided other evidence that **PANDO** is depositing the DTO's proceeds into the EA Pando Account via cash deposit. In that conversation, on September 29, 2023, **PANDO** provided UM2 with a balance of $11,217.37 for the "warehouse, yard, and ranch"—which law enforcement believes is in reference to the 29th St. Shop and the Wellston lab.

---

[5]  The conversations between Pando and UM described herein were originally transmitted in the Spanish language. These conversations have been translated by an FBI linguist. The descriptions of these conversations are, in turn, your affiant's interpretations of those conversations based on these initial translations provided by the FBI linguist. This is true for all other conversations described herein by other parties.

[6]  During a covert search of the 29th St. Shop on September 22, 2023, law enforcement found a business card attached to the modified garage bay door for "Jose's Garage Doors LLC".

In addition, **PANDO** told UM2 he would send an account statement via his secretary, whom law enforcement knows to be Veronica Gonzalez Martinez (Gonzalez) on October 2, 2023. It appears that account statement was sent and the DTO paid back **PANDO** and Gonzalez: two days later, on October 4, 2023, Gonzalez made a $11,217 cash deposit into the EA Pando Account. Based on my training, experience, and knowledge of the investigation, I believe that these were drug proceeds provided to **PANDO** as either payment or reimbursement for expenses paid for the 29th St. Shop and the Wellston lab.

15.    After the search warrant at the Wellston lab and Rodriguez's and Equihua's arrests, law enforcement also searched the contents of Rodriguez's cellular telephone. In that cell phone, law enforcement found a WhatsApp conversation between Rodriguez and Gonzalez[7]—**PANDO's** employee. On November 29, 2023, Gonzalez sent Rodriguez a screen shot of a combined invoice that included rent for the "Wellston Rancho", "701 SE 29th", and various utilities/fees totaling $10,765.51. The conversation continued in which Rodriguez coordinated with Gonzalez to drop off the money owed the morning of Saturday, December 2, 2023. A surveillance camera placed in the area of 4720 S Western Avenue, Oklahoma City, Oklahoma (EA Pando Investments

---

[7]    The phone number associated with this conversation was (580) 483-7959. AT&T provided the Billing Party for this account as Ever A Pando Uribe and the User Information as Veronica Gonzalez.

LLC's business location[8]) captured the meeting on this date. At 8:12 a.m. a red pickup truck arrived in the parking lot. At 8:24 a.m. a silver SUV arrived, and a female (presumably Gonzalez) got out and entered the business. At this same time, Rodriguez exited the red pickup truck and approached the business. Rodriguez returned briefly to the truck, approached the driver side door, and retrieved what appeared to be a white envelope before returning to the business. Equihua followed Rodriguez into the business. At 8:30 a.m. Rodriguez and Equihua both exited the business, got into the red pickup truck, and departed. Two days later, on December 4, 2023, Gonzalez made an $11,110 cash deposit into the EA Pando Account. Based on my training, experience, and knowledge of the investigation, I believe that at least $10,765 of this deposit were the drug proceeds provided to Gonzalez by Equihua and Rodriguez, two of the DTO's conversion lab workers.

16. Moreover, I believe these were not the first two cash deposits into the EA Pando Account that consisted of the DTO's drug proceeds. On June 6, 2023, a $12,000 cash deposit was made into the EA Pando Account. The

---

[8]     4720 S Western Ave, Oklahoma City, Oklahoma is the office location of several of **PANDO's** businesses, including EA Pando Investments LLC, Pando Capital Group, Pando Capital Group – Realty, Pando Capital Group – Insurance, and Pando Capital Group – Mortgage. Each company is owned by Pando, and "Pando Capital Group's Facebook page has a photograph of Pando inside the location. The Facebook Pages also list the address of 4720 S. Western Ave, Oklahoma City, Oklahoma for all versions of the businesses. A Google search for Pando Capital Group also provides the Western Ave address and a link to their website showing the same address as well.

deposit slip's memo line read, "Wellston payment"—indicating to law enforcement this was another combined payment for both the Wellston lab and the 29th St. Shop. There were also other cash deposits made near the beginning of months both before and after this June 2023 deposit, including $10,000 on September 8, 2022, $10,038 on October 4, 2022, $10,325 on November 1, 2022, $7,000 on December 5, 2022[9], $10,540 on January 4, 2023, $11585 on February 1, 2023, $12,400 on March 1, 2023, $12,000 on April 3, 2023, $12,000 on May 1, 2023, $12,000 on June 2, 2023, $12,500 on July 3, 2023, and $12,540 on August 1, 2023. These cash deposits, including those on October 4, 2023, and December 4, 2023, totaled $155,455. Though the deposit slips for these cash deposits did not provide any information in the memo section, I do not believe that these cash deposits were legitimate proceeds from EA Pando Investments LLC. Law enforcement obtained records for the EA Pando Account between December 2021 and August 2023. In that time, the above-described cash deposits are the only ones between $7,000 and $13,000. And they begin, not coincidentally, the day after **PANDO** purchased the 29th St. Shop and account for every month going forward.

---

[9]    Although $7,000 is significantly lower than that the approximate amount for all other cash deposits, it just so happens to be the agreed-upon price for the 29th St. Shop, according to the invoice Gonzalez sent to Rodriguez in November 2023.

17.    Further, **PANDO's** interview with law enforcement leads me to believe these deposits are drug proceeds provided by the DTO to pay for the 29th St. Shop and the Wellston lab. Law enforcement interviewed **PANDO** on December 8, 2023—the day the Wellston lab was searched—about the meth conversion lab found at his property. During this interview, **PANDO** indicated that the Wellston lab and the 29th St. Shop were rental properties in which the renters paid cash. **PANDO** identified one other renter that leased a two-and-a-half-acre property that paid cash[10], but indicated all other renters used electronic fund transfers. **PANDO** also indicated the last time he went to the Wellston lab was in October 2023 to clean up the property in preparation for an appraisal. He also stated that when he visited the property, he never went inside the garage—the location law enforcement found the meth conversion lab. Based on my training, experience, and knowledge of the investigation, I believe that **PANDO** was well aware of the meth lab inside the garage. When law enforcement searched his phone, they found a WhatsApp conversation between **PANDO** and Rodriguez, who was using (405) 977-9919[11]. On October 18, 2023, **PANDO** told Rodriguez the "inspection"—which I believe was a

---

[10]    Law enforcement has not been able to identify the specific two-and-a-half-acre property that **PANDO** was referencing here.

[11]    Law enforcement knows this to be Rodriguez's number because a cellphone using this number was seized from Rodriguez during his arrest on December 8, 2023.

reference to the upcoming appraisal—was set for Thursday. Rodriguez responded the following day asking if they (presumably Rodriguez and Equihua) could go to the property that day. **PANDO** told him, "There's no problem . . . Just keep the garage closed". I believe this was additional evidence that **PANDO** knew about the meth lab in the garage and was directing Rodriguez to keep the appraisers out of that area.

18. In closing, based on my training, experience and knowledge of the investigation, I believe that the **Subject Property** contains evidence of the DTO's drug trafficking and money laundering activities. I believe since this is **PANDO's** place of business there will be several records kept on computers and other electronic devices within this property, including cell phones utilized by Gonzales and **PANDO** in furtherance of the DTO's activities. Specifically, I believe the **Subject Property** is likely to contain additional evidence on the cash deposits related to the rent payments for the 29th St. Shop and the Wellston Property. I also believe the **Subject Property** will contain evidence relating to **PANDO's** dominion and control over the 29th St. Shop and the Wellston Property.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

19. As described above, and in Attachment B, this application seeks permission to search for records that might be found on the **Subject Property**, in whatever form they are found. One form in which the records might be

found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

20.    *Probable Cause.* I submit that if a computer or storage medium is found on the **Subject Property**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

 a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

 b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods

18

of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on my familiar with trucking companies, particularly those that appear to engage in cross-country transportation like DARE Express, I am aware that computer equipment is used to generate, store, and print documents used in the trucking industry, and hence here the drug conspiracy. scheme.  Given this, there is

19

reason to believe that there is a computer system currently located on the **Subject Property**.

21.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Subject Property** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the

20

computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media can indicate who has used or controlled the computer or storage media.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional

21

electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be

22

merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, I believe storage mediums on computers found at the **Subject Property** will contain evidence relevant to trips made by trucks in the DARE Express fleet. This may or may not include information on trips taken by the black semi-truck. Should records not exist on Estrada's trips in the black semi-truck to Georgia and Oklahoma City, trips law enforcement has identified as meth deliveries, that too could tend to indicate of the computer user's guilt.

22. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing

23

storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

   b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems,

application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

23. *Nature of Examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

24. EA Pando Investments LLC and Pando Capital Group are

25

companies that do appear to conduct some regular business. The seizure of these companies' computers may limit its ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of EA Pando Investments LLC or Pando Capital Group LLC so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of these companies' legitimate business. If after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## INFORMATION PERTAINING TO UNLOCKING ELECTRONIC DEVIES WITH BIOMETRIC FEATURES

25.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following.

26

26.    I know from my training and experience, as well as from
information found in publicly available materials published by device
manufacturers, that many electronic devices, particularly newer mobile
devices and laptops, offer their users the ability to unlock the device through
biometric features in lieu of a numeric or alphanumeric passcode or password.
These biometric features include fingerprint scanners and facial recognition
features. Some devices offer a combination of these biometric features, and the
user of such devices can select which features they would like to utilize.

27.    If a device is equipped with a fingerprint scanner, a user may
enable the ability to unlock the device through his or her fingerprints. If a
device is equipped with a facial recognition feature, a user may enable the
ability to unlock the device through his or her face. The device can then be
unlocked if the camera detects a face with characteristics that match those of
the registered face.

28.    In my training and experience, users of electronic devices often
enable the aforementioned biometric features because they are considered to
be a more convenient way to unlock a device than by entering a numeric or
alphanumeric passcode or password. Moreover, in some instances, biometric
features are considered to be a more secure way to protect a device's contents.
This is particularly true when the users of a device are engaged in criminal

activities and thus have a heightened concern about securing the contents of a device.

29.    As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

30.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

31.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical

28

characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the **Subject Property** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

32.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **Subject Property** and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

29

## CONCLUSION

33.     Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence relating to violations of 21 U.S.C. §§ 841(a) and 846 will be found at the **Subject Property**.  I therefore respectfully request issuance of search warrants for the **Subject Property** (as set forth in **Attachment A**) based on the above-mentioned facts.

**FURTHER THE AFFIANT SAYETH NOT.**

I declare under penalty of perjury that the foregoing is true and correct this 22 day of March 2024.

_____
Special Agent Hanna Ortego
Federal Bureau of Investigation (FBI)

Subscribed and sworn to before me this 22nd day of March 2024.

_____
SHON T. ERWIN
United States Magistrate Judge

30

## Attachment A

The place to be searched is 4720 S Western Ave., Oklahoma City, Oklahoma.



**Attachment B**

**ITEMS TO BE SEIZED**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (manufacturing, distribution, and/or possession with intent to distribute, controlled substances) and 21 U.S.C. § 846 (conspiracy to do the same), namely:

1.     Documents, records, or materials related to the distribution of illegal drugs, including, but not limited to: ledgers, address books, telephone books, telephone bills, telephone records, rent receipts, rental car agreements, mini-storage receipts, cellular telephone agreements, pager rental agreements, bills and receipts related to cellular telephones and pagers, and any property and/or U.S. currency being proceeds of or related to the distribution of illegal narcotics. Also ledgers containing quantity of narcotics possessed, ledgers of money owed to the suspects for narcotics they have provided to co-conspirators, ledgers of money owed by the suspects to their suppliers, transportation and distribution instructions for the narcotics being sold, and other types of documentation regarding the sale of narcotics.

2.     Financial documents evidencing the illegal distribution of controlled substances, including, but not limited to: bank statements, bank deposit slips, canceled checks, money orders, money order receipts, wire transfer receipts, stored value cards, handwritten notes depicting monies owed for illegal controlled substances, documents showing purported income, and any other evidence showing monetary records of the illegal distribution of controlled substances.

3.     Documents, records, or materials related to the laundering of money, including, but not limited to: wire transfer receipts, bank deposit slips, bank withdraw slips, money order receipts, records detailing the purchase of property, items which show control of real property placed in nominee names such as utility payment records, property

1

tax payment records, key to real property, receipts from payment of insurance premiums paid on residences/vehicle.

4.    The fruits and proceeds of the illegal distribution of controlled substances, including, but not limited to: large amounts of currency, financial instruments and other items of value showing the spending of large sums of money made from engaging in the illegal distribution of controlled substances, or other illegal activities.

5.    Any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

    a.    With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

2

    iii.      evidence of the attachment of other devices;

    iv.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v.      evidence of the times the device was used;

    vi.      passwords, encryption keys, and other access devices that may be necessary to access the device;

    vii.      applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    viii.      records of or information about Internet Protocol addresses used by the device;

    ix.      records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

b.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form,

3

including in digital form on any digital device and any forensic copies thereof.

c.      As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, cellphones, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

6.      Items which tend to show dominion and control of the property searched, including, but not limited to, utility bills, telephone bills, correspondence, rental agreements, property tax payment records, receipt from the payment of insurance premiums on the residence, and other identification documents.

7.      During the execution of the search of the **Subject Property** described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **Subject Property** and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

4